# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

TRACEY COLVELL,

                                    Plaintiff,

        v.                                                      5:12-CV-305
                                                                (GTS/ATB)
COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

---

GREGORY R. GILBERT, ESQ., for Plaintiff
SIXTINA FERNANDEZ, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

Plaintiff applied for both Social Security Disability Benefits and Supplemental Security Income ("SSI") benefits on July 21, 2006. (Administrative Transcript ("T") 182-90). The applications were denied, and plaintiff requested a hearing. (T. 94-99, 102). On June 11, 2009, plaintiff appeared before Administrative Law Judge ("ALJ") Thomas Tielens, who denied plaintiff's claim in a decision dated July 30, 2009 ("2009 decision"). (T. 27-50, 72-84). Plaintiff requested review of ALJ Tielens's decision, and on March 19, 2010, the Appeals Council reversed the ALJ's decision and remanded the case to ALJ Tielens for further review and analysis. (T. 87-88).

ALJ Tielens held a new hearing on July 27, 2010, and after consideration of

additional evidence, denied plaintiff's claim in a decision dated August 20, 2010

("2010 decision"). (T. 51-66, 7-26). The ALJ's decision became the final decision of

the Commissioner when the Appeals Council ("AC") denied plaintiff's request for

review on January 27, 2012. (T. 1-6).

## II.    ISSUES IN CONTENTION

Plaintiff makes the following arguments:

(1)    The ALJ erred in failing to afford plaintiff at least a "closed period" of disability beginning May 21,[1] 2005 until July 2006, due to plaintiff's sustained battle with renal cancer and multiple hospitalizations.[2] (Pl.'s Br. at 8) (Dkt. No. 12).

(2)    The ALJ erred in finding that plaintiff's migraine headaches and her bilateral knee impairments were not "severe" under the regulations. (Pl.'s Br. at 8-10).

(3)    The ALJ failed to give adequate weight to the opinion of treating physician, James Sawyer. (Pl.'s Br. at 10-12).

(4)    The ALJ's credibility determination was not supported by substantial evidence. (Pl.'s Br. at 12-16).

(5)    The ALJ erred in determining that plaintiff was capable of performing a full range of light work without taking vocational testimony in violation of the AC's remand order. (Pl.'s Br. at 16-17).

Defendant argues that the ALJ's decision is supported by substantial evidence

---

[1] Plaintiff's brief states that the date of onset is May 21, 2005. However, the ALJ states that plaintiff is seeking disability as of May 1, 2005. (T. 10 (2010 decision), T. 75 (2009 decision)). Plaintiff's "Disability Determination Transmittal" states that plaintiff's Alleged Onset Date ("AOD") is May 1, 2005. (T. 70). This discrepancy does not affect the court's decision in any way.

[2] The court assumes that plaintiff is arguing only in the alternative, that the ALJ should have afforded her at least a closed period of disability. Plaintiff's main argument is that the ALJ should have granted her disability outright.

and must be affirmed.  For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## III.  APPLICABLE LAW

### A.  Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment,

3

the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the

decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV. FACTS

Plaintiff's counsel has extensively stated the medical and vocational facts in his brief. (Pl.'s Br. at 3-5). Defense counsel has incorporated plaintiff's summary, "with the exception of any inferences or conclusions asserted by plaintiff." (Def.'s Br. at 2) (Dkt. No. 14). Defense counsel has also incorporated the facts as stated in the ALJ's August 20, 2010 decision. (*Id.*) This court will also incorporate the facts as stated by both counsel, with any exceptions as noted in the discussion below.

## V.    THE AC REMAND and the ALJ'S AUGUST 2010 DECISION

In vacating and remanding the ALJ's 2009 hearing decision, the AC found that the ALJ's RFC determination was not properly supported. In his 2009 decision, the ALJ held that plaintiff could perform a full range of light work. The AC found that in making this determination, the ALJ gave controlling weight to the RFC evaluation by plaintiff's treating physician, Dr. Sawyer. However, in doing so, the ALJ did not address Dr. Sawyer's limitation on plaintiff's inability to walk on uneven surfaces, her "left foot limitation," or the limitation on her ability to stand and walk, which would not allow the performance of a full range of light work. (T. 87).

The AC also found that, although the ALJ did not find that plaintiff's headaches and knee impairments were "severe," the ALJ did not adequately address the evidence of the treatment that plaintiff received for her headaches. (*Id.*) Finally, the AC stated that although the ALJ gave substantial weight to Dr. Kalyani Ganesh's consultative report, Dr. Ganesh examined plaintiff before she was treated for her headaches and knee problems. (*Id.*)

The AC remanded the case to ALJ Tielens, with instructions to obtain additional evidence concerning plaintiff's impairments, "as needed," in order to complete the administrative record "in accordance with the regulatory standards. (T. 87). The additional evidence could include "appropriate consultative examinations and medical source statements about what the plaintiff could still do despite her impairments. (T. 88). The ALJ was also instructed to "[g]ive further consideration to the [plaintiff's] maximum [RFC] during the entire period at issue and provide rationale with specific

references to evidence of record in support of [the] assessed limitations." (*Id.*)  In doing so, the ALJ was instructed to evaluate treating and non-treating sources and explain the weight given to each.  The AC also stated that "as appropriate" the ALJ could request the treating and non-treating sources to provide additional evidence or clarification of their opinions. (*Id.*)

Finally, the AC stated that "[i]f warranted by the expanded record," the ALJ could obtain evidence from a vocational expert ("VE") to clarify the effect of any assessed limitations on the plaintiff's occupational base. (T. 88).  The AC decision contained further instructions on how to analyze the VE's evidence if the ALJ should call a VE. (*Id.*)

The only additional evidence obtained by ALJ Tielens on remand was an updated consultative examination and RFC by Dr. Ganesh. (T. 691-701).  In his 2010 decision, the ALJ continued to find that only plaintiff's "status-post nephrectomy was a severe impairment." (T. 12).  The ALJ also discussed each one of plaintiff's other impairments and specifically found them not to be severe.  (T. 13-15).  The ALJ extensively discussed plaintiff's throat difficulties; headaches; pain in both knees; pain in her low back; her carpal tunnel syndrome; and her mental impairment. (*Id.*)

At Step Three of the analysis, the ALJ found that none of plaintiff's impairments, singly or in combination met or medically equaled a listed impairment.[3] (T. 16).  After considering all the evidence, including the new information obtained from Dr. Ganesh, the ALJ still found that plaintiff could perform a full range of light

---

[3] Plaintiff does not dispute this finding.

work. (T. 16-19). The ALJ also found that plaintiff could not perform her past relevant work. (T. 19). Given this finding, the ALJ used the Medical Vocational Guidelines ("the Grid") to find that, based on plaintiff's age, education, and work experience, the plaintiff was not disabled according to the regulations from May 1, 2005 until the date of his decision on August 20, 2010. (T. 19-20).

## VI. DISCUSSION

### A. Severe Impairments

#### 1. Legal Standards

The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step 2 if it does not significantly limit a claimant's ability to do basic work activities). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.

1521(b).  It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of " 'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' "  *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3).  The Second Circuit has held that the Step 2 analysis "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps 3 through Step 5 must be undertaken.  *Id.* at 1030.

Often when there are multiple impairments as in this case, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step 2 may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone.  *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)).  This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*,

9

54 F.3d at 1031.

## 2. Application

In this case, plaintiff argues that the ALJ erred in finding that plaintiff's "bilateral" knee impairments and her migraine headaches were not "severe" under the regulations. However, ALJ did not dismiss the action for lack of a severe impairment. The ALJ found that plaintiff's status post-nephrectomy (removal of her kidney due to a renal cell carcinoma) was severe under the regulations. (T. 12). The ALJ then analyzed plaintiff's abilities considering **all** of her impairments, even those that were not severe and some that were not "medically determinable." (T. 13-15). The ALJ continued his determination and engaged in the five-step analysis as directed by the AC. The ALJ considered each of plaintiff's impairments separately in determining that none of the other impairments imposed more than a minimal limitation on plaintiff's ability to perform basic work activities. (T. 13-15). Thus, even though the ALJ found the knee impairments and migraines "not severe," at worst he committed harmless error because he ultimately considered the limitations imposed by these two impairments in his subsequent analysis.

In addition, the court notes that the AC faulted the ALJ's finding that plaintiff's knee impairment and headaches were not severe because the ALJ relied upon Dr. Ganesh's consultative examination, when the examination did not take place until after the plaintiff was treated for knee pain and headaches. (T. 87). On remand, the ALJ obtained the 2010 updated consultative examination from Dr. Ganesh, who indicated that the plaintiff asserted that she had knee problems "off and on for *ten*

years." (T. 698) (emphasis added). If this statement were true, then plaintiff's knees would have already been bothering her when Dr. Ganesh examined her in 2007. The ALJ noted that plaintiff never reported any knee pain to Dr. Ganesh during the 2007 examination. (T. 13). With this additional information, the ALJ correctly reasoned that if plaintiff's knee problem was not bothering her sufficiently to mention it to Dr. Ganesh in 2007, it did not affect her ability to perform work-related functions in 2007.

Dr. Ganesh examined plaintiff's knees for the 2010 report and stated that "according to background information" the plaintiff has chondromalacia and had left knee arthroscopic surgery. (T. 698). Notwithstanding these allegations, Dr. Ganesh found that plaintiff's gait was normal; she could walk on her heels and toes without difficulty; could squat fully; had full range of motion in both knees and ankles; her joints were stable and non-tender; there was no swelling; no atrophy; no sensory deficits; and 5/5 strength in her upper and lower extremities. (T. 699, 700).

With respect to plaintiff's right knee, the ALJ noted that x-rays of the knee in August 2006 were negative, and restated the findings above from Dr. Ganesh's 2010 examination. (T. 14). An MRI of plaintiff's knee in April of 2008 showed Grade II signal injury, posterior horn of the medial meniscus. (T. 648). The discussion referred to the increased signal as "minor." However, no meniscal tear was seen, and the clinical impression was "possible ACL strain." (*Id.*) The 2008 MRI also showed no osteochondral injury, no bony contusion or marrow edema. The medial and lateral ligaments were unremarkable, the quadriceps and patellar tendons were normal in signal and insertion. The patellar facets were well maintained, and the patellofemoral

retinacula were intact. (*Id.*)

A review of Dr. Baker's (plaintiff's orthopedic surgeon) reports confirms Dr. Ganesh's findings. (T. 546-53). When Dr. Baker diagnosed plaintiff's chondromalacia[4] and compression syndrome in her knees in July of 2008, he noted that plaintiff had "been experiencing pain for the past several months," but that she had injured her knee when she was eight years old and was hit by a car. (T. 546). The report indicates that Dr. Baker was conducting a "further evaluation of her left knee discomfort." (T. 546). However, his "Assessment" states that plaintiff had "bilateral" knee lateral compression syndrome "worse on the left than the right" and "bilateral" chondromalacia. (*Id.*)

Notwithstanding the diagnosis, there were no abnormalities on the x-ray, and on physical examination, knee flexion was 125 degrees on both sides, alignment was neutral, her gait was normal, there was no swelling, no joint tenderness, no medial or lateral laxity with stress, muscle strength was normal, and there was no quadriceps atrophy. (T. 546). Although there was a positive patellar inhibition test on the left knee and positive patellar compression test on both knees, many of the diagnostic tests were negative.[5] (*Id.*) Dr. Baker suggested physical therapy, and noted that plaintiff had an MRI in the past that revealed a grade II signal, but he could not find positive

___

[4] Chondromalacia patella, is a general term indicating damage to the cartilage under the kneecap. http://www.mayoclinic.com/health/chondromalacia-patella/DS00777. The condition is also referred to as "patellofemoral pain syndrome. *Id.*

[5] The following tests were all negative: McMurray's test (circumduction test to evaluate for meniscal tears; Lachman's test, anterior and posterior draw tests (to evaluate for anterior and posterior cruciate ligament tear); pivot shift test (also for cruciate instability).

meniscal findings on examination. (T. 547).

In September of 2008, Dr. Baker conducted a follow-up examination. (T. 550).
Plaintiff told Dr. Baker that her right knee was "feeling better." (*Id.*) Plaintiff could
perform active straight leg raising with no pain. (T. 550). There was no joint effusion,
and all the same diagnostic tests performed during plaintiff's previous examination
were negative. (*Id.*) Dr. Baker gave plaintiff an Kenalog (cortisone) injection in her
left knee. (*Id.*) Plaintiff underwent diagnostic arthroscopic surgery in January of 2009.
(T. 551). There was some tenderness and bruising near the incision sites, but plaintiff
stated that she was feeling somewhat better. (*Id.*)

The existence of an impairment such as chondromelacia does not necessarily
make that impairment "severe." The ALJ found that whatever limitations were caused
by plaintiff's knees did not last for twelve consecutive months, and did not pose more
than a minimal limitation on her ability to perform work-related activities. Based
upon Dr. Ganesh's updated consultative examination and RFC analysis, the ALJ's
finding was supported by substantial evidence.

With respect to plaintiff's migraines, the ALJ noted that plaintiff never
mentioned her headaches to Dr. Ganesh in 2007, even though she testified that she had
a history of headaches since she was fifteen years old, and must have worked despite
these headaches. (T. 13). Plaintiff was referred to Dr. Brainman in July of 2008, to
whom she reported that her headaches had worsened over the past two years. (T. 543).
There are only two reports from Dr. Brainman in the record, and it appears that
plaintiff stopped going to Dr. Brainman because she moved out of the county. (T.

However, the ALJ also found that as of May of 2010, plaintiff took only over-the-counter Tylenol for her headaches. (T. 698). Thus, the ALJ's analysis of the functional limitations imposed by plaintiff's knee problems and migraines is supported by substantial evidence.

### C.    Treating Physician

#### 1.    Legal Standard

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

#### 2.    Application

Plaintiff argues that the ALJ made inconsistent rulings regarding Dr. Sawyer, plaintiff's primary care treating physician. Plaintiff argues that in the ALJ's initial decision, Dr. Sawyer's opinion was given "controlling weight," while in the 2010 opinion, Dr. Sawyer's opinion was only given "some weight." Each time, the ALJ found that plaintiff was capable of a full range of light work activity.

The ALJ's first decision was dated July 30, 2009. The RFC evaluation before

the ALJ at that time was Dr. Sawyer's February 24, 2009 RFC evaluation. (T. 685-89). In that evaluation, Dr. Sawyer found that plaintiff could lift and carry up to 50 pounds occasionally, lift up to ten pounds frequently, and carry up to twenty pounds frequently. (T. 685). Dr. Sawyer also found that plaintiff could sit and stand for two hours at time for a total of four hours sitting and two hours standing. (T. 686). She could walk for one hour at a time for a total of two hours in an eight hour day. (*Id.*) According to Dr. Sawyer's RFC, plaintiff could use her right hand frequently for reaching, handling, fingering, feeling and pushing and pulling, but could only occasionally use her left hand for all of those functions. (T. 687). A handwritten note below the "left hand" portion of the form states "wrist problems ? carpal tunnel." (*Id.*)

Dr. Sawyer's RFC form also indicates that plaintiff could frequently use her right foot to operate foot controls, but could only occasionally use her left foot. Although Dr. Sawyer stated that plaintiff could never drive, the reason was that she did not have a license, and was not related to her medical conditions. (T. 688). Finally, the form indicates that plaintiff could perform a variety of activities, including shop, travel without assistance, use public transportation, climb a few steps at a reasonable pace with the use of a single handrail, perform personal hygiene, and use paper/files. (T. 689). The only activity that Dr. Sawyer indicated plaintiff could not perform was "walking a block at a reasonable pace on rough or uneven ground." (*Id.*)

The AC noted that the ALJ gave Dr. Sawyer's 2009 RFC controlling weight in finding that plaintiff could perform a full range of light work, but that this RFC did not support such a finding because the 2 hour standing and walking limitation "would not

allow the performance of a full range of light work." (T. 87). The AC also found that the ALJ did not properly address Dr. Sawyer's limitation regarding the inability to walk on rough or even surfaces and the "left foot limitation." (*Id.*) Plaintiff argues that it was error for the ALJ to give Dr. Sawyer's RFC controlling weight in the first decision, but only some weight in his second decision.

This court disagrees. On remand, as ordered by the AC, the ALJ obtained "additional evidnece" in the form of an updated consultative evaluation from Dr. Ganesh.[6] Although plaintiff argues that the ALJ should have recontacted the treating physician, the ALJ was not "ordered" to do so. The AC stated that the ALJ "***may*** request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinion." (T. 88) (emphasis added). Dr. Ganesh reexamined plaintiff and submitted an updated RFC. (T. 691-701). The RFC submitted by Dr. Ganesh is consistent with her 2007 evaluation and is quite different than Dr. Sawyer's opinion. In 2010, Dr. Ganesh finds that plaintiff can lift and carry up to 50 pounds continuously (over 2/3 of the time), can sit for 8 hours during the day, and can stand and walk 6 hours per day, for a total of 8 hours during the day. (T. 691-92). She could perform all the physical functions listed above with both her right ***and*** left hands. (T. 693). Plaintiff could also use both feet to operate foot controls. (*Id.*) Plaintiff could climb stairs, use ramps, and stoop frequently, but could never balance or climb ladders. (T. 694). Dr. Ganesh found almost no environmental limitations and

---

[6] One of the problems noted by the AC was that Dr. Ganesh examined plaintiff in 2007, before she was treated for her headaches, and thus, Dr. Ganesh may not have had all the relevant information when completing plaintiff's first consultative evaluation. (T. 87).

that plaintiff could engage in a wide variety of physical activities. (T. 695-96). There was no limitation involving the inability to walk on rough or uneven ground.

Dr. Ganesh's May 2010 examination took all but one of plaintiff's alleged impairments into consideration. (T. 698). Dr. Ganesh mentioned plaintiff's cancer and gallbladder surgeries, her bilateral knee problems, her headaches, low back pain, and her shoulder pain. (*Id.*) Her examination found that plaintiff's gait was normal, she could walk on her heels and toes without difficulty, she could squat fully, her stance was normal, and she needed no help changing for the examination or getting on and off the table. (T. 699). She had full flexion, extension, bilateral flexion, and full rotary movement bilaterally in both her cervical and lumbar spine. There was no scoliosis, kyphosis, or abnormality in her thoracic spine. (T. 700). Straight leg raising was negative bilaterally, and she had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. Hip flexion was 75 degrees and her backward extension was full. (*Id.*) She had a full range of motion in both knees, joints were stable and non-tender, with no redness, heat, swelling, or effusion. (*Id.*)

Plaintiff's deep tendon reflexes were absent in her upper and lower extremities, but there was no sensory deficit, and her strength was 5/5 in the ***upper*** and lower extremities. Her extremities showed no cyanosis, clubbing or swelling. Her pulses were physiologic and equal, and she had no muscle atrophy. Although Dr. Ganesh did not mention carpal tunnel in her introduction, her examination found that plaintiff's hand and finger dexterity were intact, and her grip strength was ***5/5 bilaterally***. (T. 700). Dr. Ganesh concluded that plaintiff had no limitations for sitting standing and

the use of her upper extremities, and a "mild" limitation for walking and climbing. (T. 701).

Dr. Ganesh's findings were very similar to her 2007 evaluation of plaintiff. (T. 524-26). On September 22, 2006, Medical Consultant, Dr. R. Finley stated that there was no evidence to suggest that plaintiff's cancer or its treatment were responsible for any current symptoms or functional limitations. (T. 519). On September 13, 2006, Dr. Santos, the surgeon who performed plaintiff's hernia surgery acknowledged that plaintiff had "other problems" that were being addressed by plaintiff's primary care physician, but stated that there were "no limitations resulting from surgery." (T. 517-18).

The court notes that the ALJ found plaintiff could perform a full range of light work. Dr. Ganesh's RFC would have allowed plaintiff to perform more strenuous work. However, the ALJ weighed all the evidence of record to ultimately determine plaintiff's RFC. The ALJ extensively discussed his reasons for discounting Dr. Sawyer's more restrictive opinion. (T. 17-18). The ALJ noted that Dr. Sawyer's listed limitations for plaintiff's left hand were purportedly due to "questionable carpal tunnel."[7] The ALJ noted that the plaintiff's primary care physician (Dr. Wilson)[8] stated that her subjective symptoms were "'not particularly in a carpal tunnel

---

[7] The statement that the carpal tunnel was "questionable" comes from the handwritten note on Dr. Sawyer's RFC: "L wrist problems ? carpal tunnel." (T. 687).

[8] Dr. Wilson was plaintiff's primary care physician prior to Dr. Sawyer. Plaintiff testified during her first hearing in June of 2009, that Dr. Wilson retired, and she had only been seeing Dr. Sawyer since January of 2009. (T. 37).

distribution' and were not significant enough to warrant treatment or referral to a specialist." (T. 17). Dr. Wilson stated on August 9, 2006 that the carpal tunnel signs were negative, and that he suspected "some carpal tunnel," but that it would be difficult to demonstrate on nerve conduction or may not be "enough to require treatment at this time." (T. 522).

The ALJ found that Dr. Sawyer's statement about plaintiff's inability to walk a block at a reasonable pace on uneven surfaces was unsupported by objective findings, and there were no treatment notes by Dr. Sawyer to substantiate this statement. (T. 18). The ALJ found that Dr. Sawyer's RFC was inconsistent with the nature of plaintiff's treatment, was inconsistent with other opinions of record, and was inconsistent with the plaintiff's description of her own activities. (*Id.*)

This court finds that the ALJ carefully weighed the evidence and properly determined the weight given to the various medical and non-medical opinions of plaintiff's RFC. Conflicting evidence is for the ALJ to evaluate, and it is the ALJ's responsibility to determine plaintiff's RFC from that evidence. *See Matta v. Astrue*, No. 12-191, 2013 WL 276086, at *2 (2d Cir. Jan. 13, 2013) (although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available and make an RFC finding that was consistent with the record as a whole) (citing *Richardson v. Perales*, 402 U.S. at 399). Thus, the ALJ properly discounted Dr. Sawyer's opinion in the ALJ's second decision.

**D. Credibility**

**1. Legal Standard**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of

the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

## 2. Application

Plaintiff argues that the ALJ did not specifically analyze each of the factors required by the regulations and Social Security Rulings. (Pl.'s Br. at 12-16). The ALJ considered all the evidence and determined that, although plaintiff's various impairments could reasonably be expected to produce symptoms, the plaintiff's statement regarding the intensity, persistence, and limiting effects of those symptoms was "not entirely credible." (T. 18).

Although the ALJ may not have used the exact words cited in the regulations, he covered the areas necessary for the evaluation of plaintiff's credibility. The ALJ found that plaintiff's complaints exceeded the objective findings and were inconsistent with the nature of her treatment since her kidney surgery and inconsistent with her activities of daily living. (T. 18). In another part of the decision, the ALJ stated that

> [t]he claimant complained of pain, sleep difficulties, trouble climbing stairs, dropping things, and an inability to lift anything heavy, bend or stoop, walk very far without resting, and stand or sit for long periods without moving (Exhibits 8E, 12E, and 14E; and Testimony). Yet the claimant was

> able to walk places, cook, do housework, and laundry,
> vacuum, shop, meet her own personal care needs, and watch
> television (Exhibits 12E, 14F,and 25F).

(T. 16). Even though this discussion was not in the "credibility" paragraph, it is clearly the ALJ's statement that plaintiff's pain and other alleged limitations were not consistent with her daily activities. The ALJ cited the specific exhibits to which he was referring, and a review of those exhibits shows that the ALJ accurately cited these inconsistencies in her "Function Report" (Ex. 12E, T. 287-88), as also shown in Dr. Ganesh's 2007 evaluation (Ex. 14F, T. 524), and Dr. Ganesh's 2010 examination (Ex. 25F, T. 699).

The ALJ also notes some inconsistencies in plaintiff's testimony and also stated that there was "evidence of medication noncompliance." (*Id.*) In different paragraphs the ALJ stated that, "[a]s of June 11, 2009, the claimant was not receiving any treatment (Testimony), and there were no new treatment records, since that time." (T. 18). The ALJ also stated plaintiff was only taking over-the-counter medication for her impairments, including her migraines. (T. 13, 18; *See* T. 55-56 (2010 Testimony)). There are two reports from Dr. Brainman regarding plaintiff's migraines, one dated July 16, 2008 and a follow-up report, dated October 9, 2008. (T. 544-45). In the October 2008 report, Dr. Brainman states that plaintiff noted a gradual reduction in her migraines to once per week, but that she had stopped taking one of the medications on her own because it was making her sick. (T. 545). Dr. Brainman stated that plaintiff should increase the vitamin B2 dosage and start taking Nortriptyline at night. Although Dr. Brainman planned to follow-up in three months, there are no further

records of treatment from this physician.[9]  Thus, the ALJ properly considered and rejected plaintiff's credibility to the extent that it was inconsistent with her ability to perform a full range of light work.

### E.    Vocational Expert

#### 1.    Legal Standard

If a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  If the plaintiff's range of work is significantly limited by his non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform.  *Id.*  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988);

---

[9] Part of the problem with plaintiff's health care was that she continued to move between counties, and each time she moved, she did not "reapply." (T. 63-64).  The court presumes that she is referring to applications for Medicaid. *See* fn.10 below.  During her 2010 hearing, plaintiff stated that she started "seeing a neurologist, and [she] took Vitamin B and some Depakote for headaches.  I saw him a couple of times, and then I moved out of the county." (T. 65).  She testified that when she was taking her medication (although she did not mention that the Depakote made her ill – and she did not even mention Nortriptyline), her headaches "eased quite a bit," even though she still had them. (T. 65).  The ALJ asked if she was still having the headaches, and plaintiff first stated "[e]very day." (T. 60).  She then stated that she only had a migraine "at least once every 10 days." (T. 60).  She also testified that her yeast infection "was under control when I had some medication.  It was pretty much under control.  I mean, I had a little bit of heartburn, but nothing like I have now." (T. 61).  She testified that her shoulder pain was gone, and that it only "lasted about five or six days, and it hasn't come back." (T. 62).

*Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Plaintiff argues that the ALJ was incorrect in finding that plaintiff was capable of a full range of light work without consulting a VE. Plaintiff's counsel bases this argument, in part, on the fact that the ALJ gave Dr. Sawyer's RFC controlling weight in the ALJ's first decision, and that the Appeal's Council found that Dr. Sawyer's RFC would not support a finding that plaintiff could perform a full range of light work. (Pl.'s Br. at 17). However, as stated above, in the ALJ's second decision, he chose to give more weight to Dr. Ganesh's updated RFC more weight. Dr. Ganesh's RFC would more than support a finding that plaintiff could perform a full range of light work. This court finds that the ALJ was entitled to give Dr. Ganesh's report more weight, and that the RFC determination was supported by substantial evidence. Therefore, the ALJ was not required to find that plaintiff's limitations would prevent a full range of light work, was not required to consult a VE.

Plaintiff also argues that her headaches would further limit her ability to perform a full range of light work because they would require her to miss work periodically. The ALJ rejected plaintiff's credibility to the extent that she claimed her pain was so limiting. She stopped seeing Dr. Brainman because she "moved out of the county," and at the time of the hearing, plaintiff was only taking over-the-counter medications for her headaches.[10] (T. 65). On May 10, 2010, she told Dr. Ganesh that

---

[10] In an undated report of her "Recent Medical Treatment," plaintiff states that she had not been to the doctor in "over a year" because she could not afford to go, so she just suffers every day. (T. 343). In this document, she mentions shoulder pain, although as stated above in footnote 9, she testified that her shoulder pain only lasted "five or six days and hasn't come back." (T. 62). In the same document, plaintiff states that she is not taking any prescription medications because she cannot

she was not taking any prescription medication. (T. 699). She testified that when she was taking her other medication, she was "benefitting from that medication regimen."[11] (*Id.*) She stated that she still had headaches, but "it eased quite a bit." (T. 65). This court finds that the ALJ correctly determined that plaintiff's headaches did not substantially limit her ability to perform a full range of light work.

### F.     Closed Period of Disability

#### 1.     Legal Standard

A plaintiff will not be found to be disabled unless she demonstrates through medical and other evidence, that she is unable to engage in any substantial gainful activity by reason of medically determinable physical or mental impairments that can be expected to result in death or which have lasted or can be expected to last for a "continuous period" of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

#### 2.     Application

Plaintiff also asks the court to find that the ALJ should have granted at least a

---

afford them. (T. 344). During the 2010 hearing, plaintiff testified that she had just moved back to Oswego County and had not yet reapplied for Medicaid. It appears that part of plaintiff's inability to obtain prescription medications is her frequent moving and her failure to apply for the appropriate benefits.

[11] Prior to being referred to Dr. Brainman, in April of 2008, plaintiff had consulted Dr. Wilson about her migraines. (T. 643-44). Dr. Wilson noted that an MRI of plaintiff's brain showed no abnormalities and that she tried a variety of medications with poor results, but on June 16, 2008, he noted that plaintiff was not taking the medication that she was prescribed. (T. 644). "She is no longer taking the magnesium oxide or vitamin B2 which we suggested before. We did have her on Elavil 25 mg in the past but she is not taking that either." (*Id.*) During the April 2004 examination, Dr. Wilson stated that, although her left knee was giving her "problems," there were no new findings on examination, and her left knee showed no effusion, click or deformity. An MRI of her lower back showed no abnormalities. (T. 643).

closed period of disability between May 21, 2005 and July 2006, based upon plaintiff's sustained battle with cancer and her multiple hospitalizations. (Pl.'s Br. at 8). The court notes that plaintiff's first medical report of record is dated May 27, 2005, and the associated reports indicate that it was the first time that plaintiff was seen by the physicians at Oswego Hospital. (T. 451, 453-54). Plaintiff told the doctor, that she had not seen a physician on a regular basis. (T. 454). She went to the doctor on May 27, 2005 because of a persistent cough. (*Id.*) She went back to the doctor on August 16, 2005. (T. 451). The doctor noted that plaintiff had not purchased the antihistamine medication because it was not covered by her insurance, but never called the doctor about it and did not show up three weeks after her last visit. (*Id.*) There was no discussion at that time of her renal cancer or any symptoms other than her persistent cough, and in August, she reported vomiting as a result of coughing. The doctor noted that a chest x-ray taken on May 27, 2005 revealed no disease. (T. 451).

The first mention of renal cell carcinoma was in October of 2005, after she went to the emergency room. (T. 345-46, 349). Part of plaintiff's problem at the time was the severe yeast infection in her throat. (T. 353). The surgery for plaintiff's kidney tumor took place in November of 2005, the surgery was without complications. (T. 419-20). Plaintiff was in the hospital for two days and made a good recovery. (T. 447). Her hernia operation was not until July of 2006, and she stayed in the hospital for five days. (T. 474-78).

While it is true that plaintiff had multiple hospitalizations during the time period that plaintiff wishes the court to grant a "closed period of disability," multiple

hospitalizations do not constitute disability. There is no indication that plaintiff's renal cell carcinoma symptoms or the limitations from either the hernia or the gallbladder surgery lasted for a continuous period of twelve months. As stated above, consultant, Dr. Finley stated in September of 2006, that there was no indication that plaintiff's cancer was responsible for any current symptoms or limitations. (T. 519). There were also no limitations from the hernia surgery. (T. 519). Thus, there is no evidence to show that plaintiff would be entitled to a closed period of disability from May 21, 2005 until July of 2006.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 19, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge